173 So. 726

**STATE ex rel. WARD v. BOARD OF SUP'RS OF ELECTIONS, PARISH OF RAPIDES, et al.**

No. 34314.

March 22, 1937.

Eugene Stanley, of New Orleans, for relator.

A. V. Hundley, Dist. Atty., of Alexandria, Gaston L. Porterie, Atty. Gen., Geo. M. Wallace, of Baton Rouge, and John H. Mc-Sween, of Alexandria, for respondents.

ODOM, Justice.

The Democratic Executive Committee for the City of Alexandria called a primary election to be held on Tuesday, April 6, 1937, for the purpose of nominating candidates for city offices, including that of Mayor, to be elected at a general election on June 8, 1937. John W. Ward, relator here, qualified as a candidate for the office of Mayor before the Democratic Executive Committee for the City of Alexandria and submitted to the chairman of that committee a list of qualified electors to be used by the committee in the selection of commissioners and watchers to hold the said primary election, as provided by section 25, Act No. 97 of 1922, as amended by Act No. 110 of 1934.

The chairman of the Democratic Executive Committee informed the relator that the committee would not consider the list of names for the reason that it had no authority under the law to select commissioners and watchers to hold the election, but that authority for making such selections and appointments was now vested in the Board of Supervisors of Elections for the Parish of Rapides under Act No. 28, Second Extra Session of 1935, which act amends and re-enacts the primary election law. He was further informed that the Board of Supervisors of Elections of Rapides Parish would assume entire control and jurisdiction over the selection of com-

missioners and watchers to hold the election, as per authority granted by Act No. 28, Second Extra Session of 1935.

When the Board of Supervisors of Elections was about to select and appoint the commissioners and watchers to hold the primary election, relator filed suit in the district court at Alexandria against the Board of Supervisors, the purpose of which suit was to prohibit it from selecting the commissioners and watchers. He specifically alleged that the board was without authority to name the officers to hold the said primary election because Act. No. 28, Second Extra Session of 1935, under which the board claimed such authority, is unconstitutional, and therefore null and void. He prayed that a temporary restraining order be issued at once and without hearing, restraining, and prohibiting the board from naming the primary election officers, and prayed further that the Democratic Executive Committee for the City of Alexandria be enjoined from canvassing the returns and promulgating the results of the illegal primary election scheduled to take place on April 6, 1937. He further prayed that the board be ordered to show cause why a preliminary injunction should not be issued restraining it from naming the election officers, and further that the Democratic Executive Committee of Alexandria be ordered to show cause why it should not be enjoined from canvassing the returns and promulgating the results of said primary election, and finally that a permanent injunction issue, etc.

Based upon the allegation that Act No. 28, Second Extra Session of 1935, is unconstitutional and void, and that therefore it was the ministerial duty of the Democratic Executive Committee of the City of Alexandria to select the commissioners and watchers to hold the said election under the primary election laws of the State, Act No. 97 of 1922, as amended by Act No. 110 of 1934, and to draw from the lists of names submitted by candidates the names of persons necessary to serve as commissioners and watchers at said election, he prayed that mandamus issue ordering and commanding the committee to perform that duty.

The court refused to issue a temporary restraining order as prayed for, but instead issued a rule nisi ordering the board and committee to show cause why a preliminary injunction should not issue as prayed for. When the rule came up for hearing the board and the committee each filed a plea to the jurisdiction of the court and exceptions of no cause of action, which pleas and exceptions were overruled. After hearing the rule on its merits, the court refused to issue the preliminary injunction and the mandamus prayed for by the petitioner. Whereupon John W. Ward, the petitioner before the district court, relator here, applied to this court for writs of certiorari, prohibition, and mandamus, in which he reiterated substantially the allegations of his petition addressed to the district court, and especially prayed that Act No. 22, First Extra Session of 1934, Act No. 8, Second Extra Session of 1934, and Act No. 28, Second Extra Session of 1935, be declared unconstitutional, null and void, and that the primary election law, Act No. 97 of 1922, as amended by Act No. 110 of 1934, be restored and made effective as the sole

law governing the calling, holding and conducting of primary elections in this State. His prayer for injunction, mandamus, etc., is the same as that made in his petition before the district court.

The writs applied for were granted. The trial judge sent up the original record in obedience to the writs and filed his answer to the rule to show cause. The Democratic Executive Committee and the Board of Supervisors of Elections have also filed answers to the rule to show cause.

In his answer to the rule, the judge replied that he overruled the plea to the jurisdiction of the court because "it is the province and duty of a Court to pass upon the Constitutionality of an "act of the Legislature, and certainly by the authority given under section 4, article 8 of the Constitution, to pass upon the Constitutionality of the several acts in question and to issue writs of Mandamus to election officials to perform the ministerial duties imposed upon them by law."

He stated as his reason for overruling the exceptions of no cause and no right of action that under section 4, article 8 of the Constitution, which provides that, "The Legislature shall enact laws to secure fairness in party primary elections, conventions, or other methods of naming party candidates," the courts "have jurisdiction to pass upon acts of the Legislature pertaining to the holding of elections, as to whether or not they comply with said Constitutional provision."

He quoted from State ex rel. Trosclair v. Parish Democratic Committee, 120 La. 620, at page 625, 45 So. 526, the following statement:

"The courts have jurisdiction by mandamus to compel officers charged with the conduct of elections to perform the specific duties imposed upon them by law."

He stated as his reason for refusing to grant the restraining orders applied for that the various acts attacked as unconstitutional had been repealed and superseded by Act No. 125 of 1936, section 1 of which reads as follows:

"Section 1. Be it enacted by the Legislature of Louisiana, That in every parish of the State it shall be the duty of the Board of Supervisors of Elections to select and appoint the commissioners, clerks, deputies and officers now provided by law to serve in every election held, whether parish, municipal, ward, school, road, sub-road, sewerage, water works, sub-water works, gravity drainage and sub-drainage district elections."

He pointed out that section 3 of the said act of 1936 repeals all laws in conflict therewith. In sum, the judge said that he could not pass upon the constitutionality of acts of the Legislature which had been repealed.

In response to the rule to show cause, the Democratic Executive Committee of the City of Alexandria and the Board of Supervisors of Elections of the Parish of Rapides answered that the trial judge erred in overruling the exceptions to the jurisdiction of the court and the exceptions of no cause and no right of action, and erred also in holding that Act No. 125 of 1936 had repealed all prior laws with respect to the appointment and commissioning of officers

to hold and conduct primary elections in this State.

█ Taking up first the question whether Act No. 125 of 1936 repealed and superseded all prior laws with reference to the selection of officers to hold primary elections in this State, we concur in the view expressed by both the attorney for the relator and the attorneys for respondents, that the judge erred in his holding on this point.

In the brief filed by the Attorney General and the District Attorney it is pointed out that the act of 1936 referred to makes no reference whatsoever to the primary election laws of the State and that from its context it is clear that it was intended to have reference only to general elections and special elections held for parishes, municipalities, wards, school districts, road and subroad districts, and elections relating to sewerage, waterworks, subwaterworks, gravity drainage and subdrainage elections. It is pointed out, and we think the argument is reasonable and well taken, that if the Legislature by the adoption of Act No. 125 of 1936 had intended to repeal the provisions for the selection of officers to hold primary elections, it would have used language positive and specific to that effect and would not have left such intention to be implied from the use of the general terms "every election held, whether parish, municipal, ward, school, road, sub-road, sewerage, water works, sub-water works, gravity drainage and sub-drainage district elections." Section 1.

The plea to the jurisdiction of the court and the exceptions of no cause of action are so related that they may be discussed under one heading.

█ In sum, the argument of counsel for the respondents as relates to the jurisdiction of the courts is that only a political issue is involved in this controversy; that all matters pertaining to elections belong to the political department of the government; and that the courts are without jurisdiction to enjoin "the executive officers from carrying out the provisions of the election laws unless authority is expressly conferred upon the judiciary in such laws." Numerous cases decided by this court are cited by counsel, which they contend support this proposition.

The other side of the proposition, as stressed by relator, is that political rights are involved and that the Constitution of 1921, section 35, article 7, specifically provides that courts shall have jurisdiction "in all cases where * * * civil or political rights are involved," and further that courts have jurisdiction to pass upon the constitutionality of acts of the Legislature in all cases where the validity of such acts is attacked.

In connection with the plea to the jurisdiction of the court, it is proper to state here that this controversy does not involve a party nomination or a primary election contest or the question of who may become a candidate in a party primary, or the discretionary rights, powers, duties, and privileges of political parties and the committees established by or under them. The burden of relator's complaint is that the Democratic Executive Committee of the City of Alexandria has refused to perform the duty imposed upon it by the primary

election laws of the State of selecting commissioners and watchers to hold a primary election which it has called, its refusal being based upon the alleged ground that such duty is now imposed upon the Board of Supervisors of Elections; and that the Board of Supervisors of Elections is assuming authority to select and appoint the commissioners and watchers to hold the said election; and that the law, Act No. 28, Second Extra Session of 1935, which the executive committee asserts has taken away from it the right to select election officers and under which the Board of Supervisors of Elections asserts the right to do so, is unconstitutional, null, and void. For this reason it is claimed by relator that the Executive Committee has no right to refuse to perform that duty, and by the same token the Board of Supervisors of Elections has no right to exercise it.

Under Act No. 97 of 1922, as amended by Act No. 110, of 1934, p. 427, it was made the duty of party committees, parish and municipal, to select commissioners and watchers to hold primary elections called by them according to the methods specifically prescribed in that act. Act No. 28, Second Extra Session of 1935, is an amendment to that law which provides that such election officers shall be selected and commissioned by the Board of Supervisors of Elections. If this amendment is unconstitutional, as relator contends, it has no effect and the original primary election laws are still in force, and therefore the executive committee has no right to refuse to appoint the commissioners and the board cannot appoint them.

In considering the question of jurisdiction and the merits of the exceptions filed by respondents, we must keep in mind the particular issues presented. Counsel for respondents cite numerous cases in support of their argument that the court has no jurisdiction, the latest of which is that of Porter v. Conway, 181 La. 487, 159 So. 725. Clearly this case has no application here. Plaintiff in that case claimed that he had been nominated as a candidate for a certain office. Conway, the Secretary of State, refused to recognize him as the nominee, and plaintiff brought suit against him to compel him to recognize his nomination.

Counsel also cite the leading case of Reid v. Brunot, 153 La. 490, 96 So. 43. The opening sentence of the opinion in that case reads as follows:

"This is a suit contesting the nomination of Harney F. Brunot by the Democratic party, at a primary election held on March 27, 1923, to the office of Associate Justice of the Supreme Court of Louisiana, from the Fifth Supreme Court district."

Plaintiff's suit was dismissed, the court holding that the plea to the jurisdiction was well founded. The reason for the holding was that courts have no jurisdiction over contests involving party nominations.

State ex rel. Burke v. Foster, 111 La. 939, 36 So. 32, another case cited by counsel, involved a dispute as to a party nomination. The court held, to quote Paragraph 2 of the syllabus, that:

"The decision of disputes as to party nominations rests with the party [evident-

ly meaning the party calling the election] whose nomination is claimed, in the absence of statutory regulations to the contrary. The jurisdiction of courts in such matters is purely statutory. Act No. 152, p. 266, of 1898, confers no jurisdiction whatever on the courts, but creates a board of contests, whose decision is made final in all questions within its cognizance.

"Hence the determination of the dispute as to the nomination complained of rests either with the party or board of contests, and the courts are without jurisdiction in the premises."

The case of Roussel v. Dornier et al., 129 La. 930, 57 So. 272, 41 L.R.A.(N.S.) 557, involved a matter pertaining to party government and discipline. The court in that case held that:

"In the absence of any statute giving them jurisdiction, the courts have no power to interfere with the judgments of the committees and tribunals of established political parties in matters of party government and discipline."

Darbonne et al. v. Village of Oberlin, 121 La. 641, 46 So. 679, another case cited by counsel, involved a local option election contest. The syllabus reads as follows:

"In the absence of statutory authorization, the courts are without jurisdiction ratione materiæ in the matter of contesting elections. Thus far the Legislature has not authorized the judiciary to pass upon the conduct of local option elections."

State v. Judge, 13 La.Ann. 89, another case cited by counsel, also involved a contest over the election of a judge outside

of Orleans parish when there was no law giving courts jurisdiction of such contests. It was there held that "in the absence of statutory authorization the courts are without jurisdiction ratione materiae, to entertain the case of a contested election, and the consent of parties cannot give them jurisdiction."

In each of these cases it was held that the courts had no jurisdiction over the particular issues therein involved. But the cases have no application here. In each of them the issue presented to the court involved either a contest over a party nomination, a contested election where there was no law giving courts jurisdiction over such contests, or a matter of party discipline and government. In the case before us no such issues are involved.

In the case of Le Blanc v. Hoffmann, 175 La. 517, at page 526, 143 So. 393, 395, the jurisdiction of the courts in cases involving political issues was discussed at length, and after reviewing the same cases cited by counsel for respondents in the case here, this court through Justice Higgins as its organ said:

"The courts of this state have jurisdiction in matters involving the proper administration of the Primary Law by the officials charged with its execution, and a mandamus will lie to compel the performance of a ministerial duty imposed by the primary law, and an injunction will issue to restrain an attempted act in violation of its provisions."

In support of this statement of the law, eleven cases decided by this court and one by the Court of Appeal are cited. While

the court held in the Le Blanc Case that it had no jurisdiction in matters involving the particular issue there raised, the above quotation from that case is a clear, concise, and accurate statement of the law as interpreted by this court in numerous cases, as relates to the issue here involved. That statement is precisely in point here.

Our conclusion is that the plea to the jurisdiction was properly overruled by the trial court.

The exceptions of no cause of action were without merit and properly overruled. If, as alleged by relator, the Executive Committee had failed to perform a ministerial duty imposed by law, he had a right by mandamus proceeding to compel the performance of that duty. In State ex rel. Elston v. Parish Democratic Executive Committee, 173 La. 844, 138 So. 857, 859, we said:

"The exception to the jurisdiction of the lower court, ratione materiae is without merit, as the courts have jurisdiction by mandamus to compel officers, charged with the conduct of elections, to perform the specific duties imposed upon them by law," citing several cases.

Certainly if courts have jurisdiction to compel officers charged with the conduct of elections to perform their duties, a citizen has a cause of action in a suit to compel that performance. And if, as said in the Le Blanc v. Hoffmann Case, "an injunction will issue to restrain an attempted act in violation of its provisions," that is, the provisions of the primary election law, surely a petition for an injunction sets out a cause of action.

As relates to the court's jurisdiction, it is finally argued by counsel for respondents that the question of the method of selecting commissioners and watchers to hold primary elections, as relates to fairness to candidates or factions in the conduct of primary elections, is a matter to be determined exclusively by the Legislature and not by the courts.

In making this argument counsel have overlooked the fact that there is more involved here than a mere political question. A constitutional question is involved. The validity of Act No. 28, Second Extra Session of 1935, is attacked on the ground that it violates the provisions of section 4, article 8 of the Constitution. Whether an act of the Legislature contravenes the fundamental law, the Constitution of the State, is a question to be determined by the courts and not by the Legislature. It is purely a judicial function.

"§ 1. The powers of the government of the State of Louisiana shall be divided into three distinct departments—legislative, executive, and judicial.

"§ 2. No one of these departments, nor any person or collection of persons holding office in one of them, shall exercise power properly belonging to either of the others; except in the instances hereafter expressly directed or permitted." Sections 1, 2, article 2, Constitution of 1921.

The Legislature has only legislative powers. It makes the laws of the State. Section 1, article 3, of the Constitution reads as follows:

"§ 1. The legislative power of the State shall be vested in a Legislature, which shall

consist of a Senate and a House of Representatives."

The right of the courts of this State to declare acts of the State Legislature unconstitutional has never been questioned.

As relates to the general proposition whether the Legislature has the final say as to what is "fair" and what is "unfair" in the sense that those terms are generally used, we cite as an illustration that it is conceded, in fact held by the courts in numerous cases, that the establishment of fair and just rates and charges which public service and public utility corporations may make, is a legislative function to be exercised through the agency of the Louisiana Public Service Commission, which is authorized "to fix reasonable and just rates." And while it may establish rates which it thinks are fair and reasonable, yet the Constitution itself provides in section 5, article 6, that the rates fixed may be reviewed and set aside by the courts; the question as to whether the rates are fair and reasonable being one to be determined finally by the courts.

The final question, then, is whether the method of selecting officers to conduct primary elections as established by Act No. 28, Second Extra Session of 1935, *secures* fairness in party primaries. If it does not and if the method therein established may lead to or result in unfairness to either a faction within the party or to a candidate for nomination in a party primary, then the law violates section 4, article 8 of the Constitution, which provides that: "The Legislature shall enact laws to secure fairness in party primary elections, conventions, or other methods of naming party candidates."

The duty imposed upon the Legislature by this article of the Constitution is mandatory. It must enact laws to make party primary elections fair to such political factions as may exist within the party and fair to all candidates who enter primaries. While the Constitution sets forth an affirmative proposition, it is pregnant with the negative proposition that the Legislature shall not pass laws making party primaries unfair to factions and candidates.

Act No. 28, Second Extra Session of 1935, now under attack, provides that:

"Section 25. That primary elections shall be conducted by five commissioners of election at each polling precinct.

"The said commissioners shall be selected and appointed in each parish by the Board of Supervisors of Elections, and shall be commissioned by the President of the Board of Supervisors of Elections."

The act further provides that the board shall commission an alternate for each commissioner appointed, who shall serve as commissioner in the absence of the commissioner for whom he is alternate, "and in case the commissioners are present at the election, the alternates shall serve as watchers." It is further provided that the commissioners at each polling precinct "shall select from amongst the electors present one watcher for each alternate commissioner who has to serve as commissioner, or who is absent." The act further provides:

"The alternates who serve as watchers and the watchers shall be commissioned in

the same manner and have the same qualifications as commissioners of election and be subject to the same penalties and punishments provided in this act in case of failure to perform their duties. These alternates and watchers shall be admitted within the barriers during the polling of the vote, but shall not be permitted to electioneer, engage in political or other discussions, or in any manner interfere with or detain or obstruct any voter. Said alternates and watchers shall be allowed to enter the polls only after the closing of the polls, and there remain during the canvass and count of the vote, but they shall take no part in such canvass and count nor have any voice in the conduct thereof. They shall have the right to challenge any voter for cause and shall call the attention of commissioners to any infraction of the law and to keep notes of the conduct of the election, and the commissioners shall protect them in the discharge of their duties."

Under this law the board of supervisors of elections is given the sole and exclusive power and authority to name all commissioners and watchers to conduct primary elections. Therefore, the election machinery for the conduct of primary elections is under the exclusive control of the Governor of the State. This is true because, under Act No. 5, Second Extra Session of 1935, the Governor has authority to appoint two of the three members of the said board and to designate the president thereof. That act contains the following provision:

"The members of the Boards of Supervisors of Elections appointed by the Governor shall serve at his pleasure. Any member appointed by the Governor who attempts to hold office after his successor has been appointed and qualified, shall be deemed guilty of a misdemeanor, and on conviction thereof shall be fined not less than $100.00 nor more than $500.00 and be imprisoned for not less than 60 days nor more than six months."

Under these acts and under the machinery set up by them for the conduct of primary elections, no faction within a party, unless it enjoys the favor of the Governor and of the Board of Supervisors, a majority of whom are appointed by the Governor, can possibly have any representation at the polls, nor can any candidate have representation unless he enjoys the favor of the Governor and of the board which he controls.

This is a radical and revolutionary departure from the system which prevailed in the State from 1900 to 1935 in relation to the question of what was thought to be a fair method of conducting party primaries.

The only method ever devised by any Legislature prior to 1935, and so far as we know the only method ever thought of, for securing fairness in primary elections, was to allow each faction and each candidate representation at the polls.

Article 215 of the Constitution of 1898 provided that:

"The Legislature shall enact laws to secure fairness in party primary elections, conventions, or other methods of naming party candidates."

Article 215 of the Constitution of 1913 is identical with the same numbered article of the Constitution of 1898 and with section 4, article 8 of the Constitution of 1921.

The first law adopted to carry out the constitutional mandate of 1898 relating to fairness in primary elections was Act No. 133, of 1900, p. 203, the purpose of which act, as stated in its title, was "to preserve the purity of primary elections." Section 3 of that act provided that the officers to conduct such elections "in any one polling place, shall not be less than three nor more than five, and the committee, body or individual having the right to appoint such officers, *shall apportion them, as equally as possible, among the opposing factions or individuals seeking the suffrage of the voters of that party at such election.*" (Italics ours.)

It is thus seen that the first General Assembly to pass a primary election law following the constitutional mandate that laws should be adopted to secure fair primary elections required that opposing factions or candidates each have representation at the polls.

The next legislation relating to primary elections was Act No. 49 of 1906, p. 66, which required all party nominations to be made by primary elections. Section 23 of that act provided that the candidates should submit to the committee calling the election a list of names from which should be drawn the commissioners, clerks, and watchers to hold the election. The names submitted were to be written by the committee on white slips of paper of uniform size and texture, and the slips deposited in a hat or other receptacle and five drawn therefrom; that "the persons whose names are written on the first three slips so selected shall be the commissioners of election to preside over the particular voting precinct, and the other two shall be the clerks of election, *and the balance of the names remaining undrawn shall be commissioned as watchers.*" (Italics ours.)

Section 23 of this act was amended by Act No. 27, Extra Session of 1907, p. 33, in which the method of selecting the commissioners, clerks, and watchers to conduct the election is precisely the same as that in the amended act.

Sections 6, 10, 12, and 25, Act No. 49 of 1906, were amended by Act No. 100 of 1908, p. 154, but these sections did not relate to the method of selecting clerks, commissioners, and watchers.

There seems to have been no further change in the primary election laws until 1916, when Act No. 35, p. 66, was adopted, providing for the calling, holding, conducting, and regulating of primary elections, and section 23 of that act set out in detail the method of selecting commissioners and clerks to hold such elections and provided also for the commissioning of watchers at each of the polling places. Under that act the method of selecting commissioners and watchers, as well as their duties and privileges, is precisely the same as that prescribed in Act No. 97 of 1922, as amended by Act No. 110 of 1934, the law in force at the time Act No. 28, Second Extra Session of 1935, was adopted.

That law provided that primary elections should be conducted by five commissioners at each polling place, who should be commissioned by the chairman of the Democratic Executive Committee calling the election, and in his absence by the vice chairman; said commissioners being required before entering upon the discharge of their duties to swear each other to faithfully, honestly, and impartially conduct the election. The method of selecting the commissioners was as follows: Each local candidate was permitted to submit to the committee on or before the twenty-fifth day prior to the date on which the primary was to be held, the name of one duly qualified voter for each voting place in the parish, or ward in a city, should there be five or more local candidates. If there were only three local candidates, each was permitted to submit the names of two voters for each precinct. The list of names submitted by each candidate had to be signed by him and dated, showing the post office address, with street number in cities, of each person on the list, with designation as to the precinct or poll at which each was nominated to serve. In case there were only two local candidates, each was permitted to submit the names of three electors. In case there were no local candidates, then candidates for state and district offices and members of Congress were permitted to submit to the committee one or more names.

The Democratic Executive Committee was required to convene at 12 o'clock noon on the 20th day prior to the date of the primary election for the purpose of selecting the officers to hold the election, the method of selection being as follows: They took all the names submitted to them by each of the candidates for each of the precincts, wrote each name submitted on a piece of white paper, the pieces of paper to be of equal and uniform size and thickness, and placed the various slips so made out in a hat or other receptacle without folding them. The committee then selected some person to draw five of the slips from the hat or other receptacle, and the persons whose names were written on the first five slips so drawn should act as commissioners to preside over the election at the particular precinct for which the names were submitted and drawn. The person selected to draw the slips from the receptacle was required to be blindfolded at the time and during the drawing of the slips. The drawing was public at the courthouse, in the presence of the committee and such spectators as were present.

All the names not drawn from the hat or other receptacle were commissioned by the committee as watchers at the polls. The watchers were commissioned in the same manner as the commissioners and were subject to the same penalties and punishments as the commissioners for failure to perform their duties.

The act specifically provided that the watchers should be permitted within the barriers during the polling of the votes, but were not permitted to electioneer or engage in political discussions, or to interfere with any voter. They were allowed to enter the polls after the closing of the polls and there remain during the canvass and count of the votes, but took no part therein. They were given the right to

challenge any voter for cause and call the attention of the commissioners to any infraction of the law and to keep notes of the conduct of the election.

Under this complete set-up for holding primary elections, each candidate who took advantage of the privilege of submitting names to the executive committee necessarily had one or more representatives at each polling precinct in the person of a commissioned officer who was required to perform his duties, for the neglect of which he might be penalized.

As only five of the persons whose names were submitted by the candidates were to act as commissioners, it might happen that one or more of the candidates would have no representative in the person of a commissioner. But in that event, the candidate was not left without representation, because each and every person whose name was left in the hat after drawing the five commissioners was commissioned as a watcher at the polls. These watchers were granted the privileges of going within the barriers during the polling of the votes, of challenging any voter for cause, of entering the polls after they closed and of remaining there during the canvass and counting of the votes, of calling attention to any infraction of the law, and of keeping notes of the conduct of the election.

The purpose of commissioning all those whose names were not drawn from the hat as watchers was to make it certain that each and every candidate have one or more representatives, with privileges and authority, at each of the polling places. While these watchers were not permitted

to interfere with the duties of the commissioners, they were permitted to go and remain behind the barriers while the votes were being cast and to enter the polls and remain while the votes were being canvassed and counted. They could not personally supervise, but could personally view every move made by the commissioners and the the voters during the entire time the votes were being cast, canvassed, and counted, and while the lists and tally sheets were being made up.

Not only have all the primary election laws enacted prior to 1935 provided that factions and individuals participating in primary elections should have representation at the polls, but the general election laws grant the same privilege to the different political parties and the candidates participating in general elections. Act No. 152 of 1898, p. 266, provided in section 11 that the Board of Supervisors of Election outside the Parish of Orleans should appoint as election officers for each voting precinct three commissioners of election and one clerk, and provided that:

"The commissioners shall be so apportioned as that not more than two of said commissioners shall be of the same political party."

Section 12 provides that in the parish of Orleans, the Board of Supervisors of Elections shall appoint the commissioners and the clerk "from lists to contain not less than six names, furnished by each of the several political parties and nominating bodies. The commissioners shall be so apportioned as to equally represent all the political parties authorized under this

act to make nominations in so far as practicable."

The provisions of section 13 of that act apply to the entire State. The section reads:

"That each of the several political parties (or nominating bodies) having candidates (upon the official ballot) shall be entitled to one watcher in each voting precinct, and said watchers shall be appointed for each election by the several political parties * * * and shall be commissioned by the Board of Supervisors."

The duties and privileges of these watchers are the same as those conferred on watchers in primary elections.

That act was amended by Act No. 99 of 1908, but not in relation to commissioners and clerks.

Section 12, Act No. 130 of 1916, p. 290 provides that in every parish of the State the Board of Supervisors of Elections shall appoint three commissioners and one clerk to preside over the election at each polling place who "shall be appointed from lists to contain not less than six names furnished by each of the several political parties. * * * In so far as is practicable, the commissioners shall be so apportioned as to equally represent all the political parties authorized by law to make nominations."

Section 13 of that act provides:

"That each of the several political parties or nominating bodies having candidates upon the official ballot shall be entitled to one watcher in each voting precinct, and said watchers shall be ap-

pointed for each election by the several political parties * * * and shall be commissioned by the Board of Supervisors."

These watchers are granted the same privileges as those granted the watchers in primaries.

We think that the system devised by Act No. 28, Second Extra Session of 1935, of having the Board of Supervisors of Elections, a majority of the members of which board are appointed and controlled by the Governor, not only fails to secure fairness in primary elections, but opens wide the door for the practice of the grossest kind of discrimination and unfairness.

The avowed purpose of the Act of 1935, as set forth in section 3 thereof, was to "secure more fairness in primary elections than has obtained under the laws heretofore enacted, and particularly in that the provisions of this act effectively do away with the dummy candidate system, by removing the motive causing dummy candidates to qualify for the purpose of participating in the selection of commissioners of election."

In making this avowal in so far as it relates to the doing away with the dummy candidate system, the Legislature overlooked the fact that it had, by Act No. 110 of 1934, done away with that system in a most effective way. The purpose of that act, as expressed in its title, was to amend certain sections of Act No. 97 of 1922, the primary election law, and to add a new section thereto "providing penalties for parties not in good faith attempting to qualify as candidates under said Act 97 of 1922, as now or hereafter amended."

The new section added is No. 34, which reads as follows:

"Any person qualifying as a candidate for nomination in any primary election in accordance with Sections 13 and 14 of Act 97 of 1922 as amended, who does not qualify solely for the purpose of being a bona fide candidate for the nomination, or any person who qualifies partly for the purpose of submitting names for candidates for commissioned watchers for another candidate shall be guilty of a misdemeanor and upon conviction therefor shall be fined not less than one hundred dollars ($100.00) nor more than one thousand dollars ($1,000.00) and imprisoned for not less than two months nor more than one year in the parish jail."

For the reasons assigned Act No. 28, Second Extra Session of 1935, p. 73, in so far as it amends and re-enacts section 25, Act No. 97 of 1922, as amended by Act No. 110 of 1934, is hereby declared unconstitutional, null, and void.

And it is now ordered that the preliminary writs heretofore issued herein be and are made peremptory, and accordingly the Hon. Levin L. Hooe, Judge of the Ninth Judicial District Court for the Parish of Rapides, is ordered and commanded to issue an order permanently enjoining the Board of Supervisors of Elections of Rapides Parish from appointing commissioners, alternates, and watchers to hold the municipal primary election ordered by the Democratic Executive Committee of the City of Alexandria to be held on Tuesday, April 6, 1937, for the nomination of candidates for municipal officers; and the said judge is further ordered and commanded to issue an order of mandamus directed to the Democratic Executive Committee of the City of Alexandria and each of its members, ordering and commanding said committee and each of its members to forthwith convene and to select the commissioners and watchers to hold the said municipal primary election in the manner prescribed by Act No. 97 of 1922, as amended by Act No. 110 of 1934.

PONDER, J., dissents and hands down reasons.

HIGGINS, J., concurs for written reasons assigned.

FOURNET, J., concurs for the reasons assigned by Justice HIGGINS in his concurring opinion.

HIGGINS, Justice (concurring).

The right of judicial review to determine the constitutionality of a legislative act is unquestionably a judicial function. The exception to the jurisdiction of the court was therefore properly overruled.

It is well-settled that the courts have the authority to protect rights of citizens granted to them under the primary election law by issuing writs of mandamus and injunction. The exceptions of no right or cause of action, were correctly overruled.

Section 4 of article 8 of the Constitution of 1921 provides that: "The Legislature shall enact laws to secure fairness in party primary elections."

It is clear that the delegates to the Constitutional Convention intended to place some restriction on the Legislature in this constitutional mandate. If this were not so, the Constitutional Convention would have merely directed the Legislature to enact primary election laws and the words "to secure fairness" would not have been used. The fairness in primary elections must therefore be secured in the legislative statute. The act in question places in the Governor's hands complete control of the election machinery through the appointment of the majority of the members of the Boards of Supervisors of Election whom he can remove at pleasure. The supervisors have the exclusive right to select commissioners and clerks of election.

It follows that fairness in the conducting of the primary elections is delegated by the Legislature to the discretion of the Governor and the Boards of Election Supervisors. Heretofore, in obedience to the constitutional requirement the Legislature sought to secure fairness in the primary elections by placing safeguards in the statute itself. The present act eliminates these protective clauses. It is my opinion that the act in question is unconstitutional, because it does not comply with the pertinent constitutional limitation on the legislative power.

For these reasons I concur.

PONDER, Justice (dissenting).

With all due deference to the majority opinion of this court, I seriously doubt the right of the injunctive relief sought and the jurisdiction of this court herein.

Conceding the jurisdiction and the right of injunctive relief, I am of the opinion that the acts annulled herein were passed to carry out the provision of section 4 of article 8 of the Constitution, which provides: "The Legislature shall enact laws to secure fairness in party primary elections."

Under the previous primary law, where there were candidates running for local offices—such as police jury members and school board members—these local candidates had the exclusive right of submitting the lists from which the commissioners and clerks were drawn and all other candidates had no choice in the selection whatsoever. The purpose of the primary election is for the members of that party to choose their own candidates. The purpose of the officials at the polls is to represent the party holding the primary and not to represent any individual candidate. These acts placed the right of selection of the commissioners and clerks in the hands of a board composed of citizens and required them to take oath. This eliminated the discrimination of allowing some candidates to have a voice in the selection of election officials and denying others that right. It would be impossible to allow all candidates a voice in such selection where many are seeking nomination to various offices. These acts positively eliminated dummy candidates. Under the previous primary laws, the local candidates had the right to submit the names from which the commissioners and clerks were drawn. Therefore, in order to secure the right to submit lists from which commissioners and

clerks were to be drawn, the practice of entering dummy candidates to accomplish this purpose was resorted to. This practice was being severely criticized at the time these acts were passed. As long as the candidates have a right to submit lists or have a right in the selection of election officials, there will be dummy candidates. No penalizing statute against dummy candidates can ever be effective for the reason that in the majority of the cases it cannot be proved that the candidate entered as a dummy.

Under the previous law, when the candidates submitted the names and they were drawn there was no fixed responsibility for the type of election officials selected; under the acts annulled herein, the Board of Supervisors of Elections is directly responsible for the type of commissioners and clerks selected. It has been human experience that it is to the best interest of government to have responsibility fixed. This board is under oath. They are directly responsible for the type of commissioners and clerks selected. The Board of Supervisors of Elections is composed of two members appointed by the Governor and the registrar of voters, who is appointed on the recommendation of the police jurors.

The Governor, who cannot be a candidate to succeed himself in office, the Board of Supervisors of Elections, the commissioners and clerks are all under oath. All these officials are presumed to do their duty and see to it that the election is fair. We cannot anticipate that public officials will derogate from their duty. The mere fact that it is possible for public officials to disregard their duty is true of any public official. The mere fact that it is possible for a law to be violated is true of any law.

The acts annulled herein positively eliminated dummy candidates, eliminated discrimination between candidates in the selection of the officials at the polls and eliminated all controversies between candidates over the right of such selection, placed the responsibility upon a board of citizens who are under oath, and placed officials at the polls who do not in any wise owe their selection to any candidate or candidates.

For the above reasons, I am of the opinion that the acts annulled herein comply with the constitutional provisions to secure fairness in primary elections.

Therefore, I respectfully dissent.